Syllabus.

## E. G. BETTS, trustee, etc., *v.* DAVID RATLIFF.

1. MORTGAGES — CROPS. — Whether or not a mortgage could be executed at common law, on a crop before it was planted, it is competent for the legislature to authorize it. This was done by act of February, 18, 1867.
2. SAME — ACT OF FEBRUARY, 18, 1867. — By sec. 7 of act of February 18, 1867, crops of cotten, corn or other agricultural product, being produced or to be produced within fifteen months, can be conveyed by mortgage or deed in trust. Such mortgage or deed in trust will have priority from its date, whether the crop be then planted or not.
3. SAME — SAME — LIEN THEREOF. — The security given by this act attaches to the commodity in advance of the harvest, and the right to apply it to the uses of the mortgage or deed in trust is as of the day of the date and the mortgagee or *cestui que trust* would have priority over any other creditor or incumbrancer, subsequent to the date of such security. It would be *ultra vires* of the legislature to impair a mortgage or deed in trust by subsequent legislation. The act of 1872 does not repeal nor is it repugnant to the act of 1867.
4. SAME — ACT OF 1872 — LIEN THEREOF. — The first section of this act gives a lien to the laborer or employee for wages, and not the tenant or lessee. The lien takes effect on all agricultural products. If the laborer is to receive moneyed wages there is no product belonging to him upon which the lien can take effect. If the wages be for a part of the crop, then the lien will take effect upon that.
5. LANDLORD AND TENANT — WHEN IT EXISTS. — It is well settled that there may be a letting of land from year to year or for one year. Where the relation of landlord and tenant exists, though the rent is to be paid in part of the product, it is equally well settled, that one may cultivate the land of another for the purpose of making a crop, which is to be divided beween the landowner and the cultivator, where the parties would be tenants in common of the crop and not landlord and tenant. Whether the contract be of one kind or the other depends on the intention of the parties, to be gathered from all the attending circumstances.
6. SAME — CASE IN JUDGMENT. — During the year 1872, W. cultivated land belonging to R., for which he was to pay a certain portion of the crop. R. furnished W. with necessary supplies during the year. In January 1872, W. executed a deed in trust to B. conveying the crop to be grown that year by him, to secure a promissory note. *Held*, that such a contract made W. and R. tenants in common of the crop, but the deed in trust having been executed prior to the passage of the act of April 5, 1872, the lien thereof was superior to the lien created by that statute.

36

ERROR to the Circuit Court of Itawamba County. Hon. B. B. BOONE, Judge.

The facts of the case sufficiently appear in the opinion of the court.

*J. B. Harris* with *Harris & George*, for plaintiff in error:

1. We contend, that even under the act of 1872, the relation of employer and employee does not so exist, as to give Ratliff a lien upon the crop, but that, clearly, from the facts, the relation of landlord and tenant exists, in which case Ratliff only had lien for his rent; and as there was no hiring, no wages, and no control over the crop by Ratliff, any lien which he might have for supplies must be an express one; there is no implied lien within the meaning of the statute. See Washburn on Real Property, vol. 1, p. 499; Dockham v. Parker, 9 Greenl., 137; Baily v. Fillebrown, ib., 12; Fry v. Jones, 2 Rawl., 11; Briggs v. Thompson, 9 Penn. St., 338; Munsell v. Carew, 2 Cushing, 50; Ross v. Swaringer, 9 Ired., 481.

2. The deed in trust, under which Betts claims, was executed on the 6th of January, 1872, and the act under which Ratliff pretends to claim was not approved until April 5, 1872, three months after.

*Clayton & Clayton* and *J. A. Brown*, for defendant in error.

Only one question can arise on the agreed statement of facts in this case. That is, where the owner of land employs a laborer to work it on shares, and furnishes the laborer supplies, while cultivating the crop, does the employer have the benefit of the first lien, created by the 10th section of the act of April 5, 1872?

Section 1, act of April 5, 1875, provides a first lien on the agricultural product in favor of laborers who work for wages. Section 10 of same act provides a first lien in favor of employers against their employees, to whom they have furnished supplies. The amendatory act of April 17, 1873, provides a similar lien in favor of laborers, to secure the share of those who work for part

of the crop, and a similar lien in favor of landlords, to secure the share of the landlord who rents his land for a part of the crop.

The 10th section is, " There shall be a first lien on all agricultural products raised in this state, in favor of every employer as against every laborer employed by him, in the production thereof, for all provisions, clothing, and necessary plantation supplies advanced or furnished, etc." The object of this section is clear. It was intended to apply to such cases as the one at bar. It is common for the owner or lessee of land to employ a laborer to cultivate part of it on shares, and he supplies the laborer while the cultivation is going on. The laborers, as a class, are shingled over with old trust deeds and judgments. The intent of the act is to make the employer secure, in advancing supplies, by a lien on the laborer's share of the product, taking precedence of those incumbrances. The legislature intended to break up a monopoly which sprung up under the agricultural lien law of 1867, to take the supply business in part out of the hands of the merchants, and give it to the managers of farms. It is founded in sound political economy.

The relation of landlord and tenant did not exist between Ratliff and Warren. Where the land owner furnishes the land, and the laborer his work, and they divide the crop, the relation between them may be that of employer and employee, or landlord and tenant, according to the facts of each particular case. In the case at bar, this question of fact was the only one submitted to the jury by the instructions, and their verdict settles the relation between Ratliff and Warren to have been, that of employer and laborer.

The 10th section cannot apply to a case where the laborer works for money wages. In such a case, the laborer has no interest in the crop to which the lien of the employer can attach, and the employer has no use for a lien on his own crop. If the laborer has absorbed his wages, in supplies furnished by his employer

while cultivating the crop, he cannot collect them again from the employer. Nothing is due the laborer, and so his lien on the product, given by the first section, cannot be enforced. So also " an assignment of his wages, by an employee, is void as against a debt due from the employee to his employer, contracted on the faith of said wages." Jennings v. Moffit, Am. Law Times Reports, August, 1874, page 367. The supply bill is a discharge *pro tanto* of the lien for wages. Nor is the employer's lien a lien on the laborer's lien for wages, as suggested for plaintiff in error. This would be useless. For without the 10th section, the employer would still have the right to apply the laborer's wages to the payment of his indebtedness for supplies. And an assignment of his wages by the employee being made, the assignee would take the claim subject to the supply bill. Neither the laborer nor his assignee could enforce the first lien for wages on the product, against the employer, without allowing the payment *pro tanto*, as made by the supplies furnished. That money wages were not intended is obvious, from the last seven lines of section 10. The proceedings therein provided to enforce the employee's lien for supplies, go on the idea that the laborer is owner of part of the crop, and it requires judicial action to divest the title out of him.

It is urged in this court for the first time, that the deed in trust was recorded three months before the passage of that act. And to construe the law as giving a lien prior to the lien of the trust deed, would be to make it unconstitutional, as a "law impairing the obligation of contracts." This question arises by accident. The agreement of facts contemplates no such point. The instruction given for Betts in the court below, shows that he knew of no such question in the case at that time. On the actual evidence in the lower court, perhaps no such point could arise. Had such a question been raised in the lower court, it might have been avoided by proof. Parties cannot thus hold back their strong point to overturn the verdict in this court, in case it is against them. Sillers v. Lester, 48 Miss., 516–524. Had this point been

presented, the facts would have warranted the jury in taking the view that Warren, a laborer, working for wages, had no right to his wages, until he had done the work.   When the crop was matured and gathered, Warren became entitled for the first time to a part of the cotton, as compensation for his labor.   But on the 5th of April preceding the acquisition of the cotton by Warren, the legislature gave Ratliff a first lien on said part of the cotton, for all supplies which he should furnish Warren.   When Warren acquired the property, the lien of the trust deed and the lien for supplies, attached to it at the same time, and the lien for supplies is made the *first* lien by the statute.   The lien of the trust deed could not attach to the property until it was acquired by Warren.   Moody v. Harper, 3 Cushman, 484; Jenkins v. Gowan, 8 George, 446–447.

Again, the cotton in controversy was not *in esse*, until the fall of 1872.   The lien of the trust deed could not attach to the property not in existence.   Butt v. Ellett, 19 Wallace, 547.   The theory on which mortgages of after acquired property are supported, is that they attach to the property *eo instanti*, on its coming into existence, and then relate back to the date of recording the mortgage, so as to cut out intermediate incumbrances.   But where the subsequently acquired property comes into existence, subject to *a superior lien* that lien takes precedence of any mortgage though the mortgage be prior to it, in time.   United States v. New Orleans R. R. Co., 12 Wallace, 362.   The agricultural lien, under the act of 1867, was a similar "*prior lien.*"   In Howard v. Simmons, 43 Miss., 89.   Simmons claimed the cotton by virtue of the lien of a judgment rendered in 1859.   Howard claimed by virtue of an agricultural lien enrolled in November, 1867.   The court gave the judgment creditor all the cotton matured and gathered prior to the registration of the lien, and the lien creditor, all which was matured and gathered afterwards, holding that the agricultural lien was "*prior*" to the judgment lien, notwithstanding the judgment lien was the older.

If the lien of the trust deed did not attach until the cotton came into existence, or until it was acquired by Warren, then on the 5th of April, 1872, at the time the law was passed, there existed no lien which that law could " impair." The act of April 6, 1872, could not impair a lien which had no existence at the time the act was approved. No lien attached to the cotton, under the deed in trust, until it came into existence, and was acquired by Warren. Such was the *status*, scope and effect in law of that contract. Therefore it could not be impaired by an act passed before the cotton was planted.

SIMRALL, J., delivered the opinion of the court.

The question of law arises upon an agreed case. The substantive facts are these: During the year 1872, Warren resided upon and cultivated land owned by Ratliff, " who had said Warren was employed to raise a crop for Ratliff, receiving one-third of the corn and one-fourth of the cotton raised thereon by Warren." During the year Ratliff furnished Warren with plantation supplies to the amount of $175, who verbally agreed that Ratliff should have a lien on the crop.

Warren, on the 6th day of January, 1872, executed a deed of trust to Betts, covering the crop of cotton to be raised that year, to secure a promissory note of $125, payable to Cummings the first of November thereafter.

Ratliff took possession of the cotton and applied it to his debt. This suit was brought by Betts, trustee for the use of Cummings, against Ratliff, for the conversion of the cotton.

The parties made no point on the testimony, but intended to raise the question whether Betts had a better right to the cotton, under the trust deed, than Ratliff, for his supplies, and the lien therefor claimed by him under the act of the 6th of April, 1872.

It will be noted that the deed in trust is about three months anterior to the passage of the law under which Ratliff asserts his lien. If by law it was competent to incumber by deed in trust

a crop before it was planted, so that it would be operative upon a crop to be thereafter planted, grown and matured, such security, to be available, must take priority as to subsequent purchasers and creditors, from the day of its execution and notice thereof.

Whether such security could be created at the common law or not, it is entirely within the power of the legislature to authorize it.

The first clause of the 7th section of the act of 1867, for the encouragement of agriculture is to the effect "that it shall be lawful to convey, by way of mortgage or deed of trust, any crop of cotton, corn or agricultural product, being produced or to be produced within fifteen months from the date of such mortgage." We cannot doubt that the intention of the legislature is, that the mortgage or deed of trust shall have preference and priority, from its date, whether the crop be then planted or not.   The prospective crop, before the seed is sown, is such potential interest or expectancy in property that it may be thus conveyed.   And when the crop grows, the *subject* has come into *esse*, and the mortgage or trust deed at once takes effect upon it.   The meaning of the statute is, that the security attaches to the commodity in advance of the harvest, and the right to apply it to the uses of the mortgage or deed of trust, is as of the day of the date; so that the mortgagee or *cestui que trust* would have priority over any other creditor, incumbrancer or purchaser, subsequent to the date of such security.

Such was the legislative understanding, for the 13th section of the act of 1872, April 5th, p. 135, declares " as the sense of the legislature, that all contracts heretofore entered into under the provisions of an act for the encouragment of agriculture, approved 18th February, 1867, are valid."

Manifestly, it would be *ultra vires* of the legislature to displace, defeat or impair a contract expressed in a mortgage or deed of trust, good under the act 1867, by subsequent legislation.

The act of the 5th of April, 1872, is not repugnant to, nor does it repeal the statute of 1867.   The main design was, to introduce

liens to secure the wages of the laborer or employee (see 1st section), and in favor of the employer, for supplies furnished to the laborer (see 10th section) ; neither of which cases were embraced in the prior statute.

The person entitled to a lien under the first section is the laborer or employee for wages, and not the tenant or lessee.

There is some obscurity in the language of the 10th section, or rather there is difficulty in giving an application of the words used, so as to make the lien beneficial against all laborers employed in the production of a crop.   The lien takes effect on all "agricultural products."   If the laborer is to receive *moneyed* wages, in such case, there is no "product" belonging to him upon which the lien can take effect for the supplies.   But if the laborer is to secure part of the crop for his "wages," then the lien would take effect upon that.   The "wages" may as well be for a part of the product as for money.

Washburn (1 vol. Real Prop., p. 500), after examining the cases, states that it is difficult, if not impossible to fix any rule by which to determine whether carrying on a farm by one not the owner upon shares, constitutes him a tenant with separate right of property in the crop, or a tenant in common of the crops, or a mere hired laborer or cropper.   It is easy to assign many, perhaps the great majority of cases, to their appropriate class.   A tenant or lessee has an interest in the soil.   Generally the products of the land are his separate property, subject to a right in the landlord to the privileges conferred by law for getting his rent, whether in kind or in money.   A demise of a farm, or so many acres, or a certain part thereof, for so much corn or cotton per acre, or for the entire premises, is a letting, and creates a tenancy.   So of a grist mill, "for one-third of the toll which the mill grinds."   Fry v. Jones, 2 Rawle Rep., 11.   If a laborer engages to work on the farm for so many bushels of corn, or pounds of cotton for the year or other definite time, this would be rendering service for wages, and would not be a tenancy.

Parties made this agreement : F. put out from 25 to 30 acres of the farm in wheat, F. to have two-thirds of the crop and R. one-third, held not to make F. a tenant of R. Adams v. McKesson, Executrix, 53 Penn. St. Rep., 84. A tenancy exists, however, if the cultivator agrees to pay a certain number of bushels of wheat as rent of the premises. Tanner v. Hill, 44 Barb., 430; 15 Barb., 597.

The law is well settled that there may be a letting of land from year to year, or for one year, where the relation of landlord and tenant exists, though the rent be paid in a part of the product. It is equally well settled that one party may cultivate the land of another for the purpose of making a crop, of which the owner of the land is to have a part and the cultivator a part, where the parties would be tenants in common of the crop, and would not sustain the relation of landlord and tenant.

Whether the contract be of the one kind or the other, depends on the intention of the parties, to be gathered from all the attending circumstances. Alwood v. Ruckman, 21 Ill., 201.

The agreed facts are very meagre in defining the terms of the contract between Ratliff and Warren. We are inclined to the opinion, and so hold, that Warren did not become the tenant of Ratliff, but was a laborer or cultivator for a share of the crop, and that he and Ratliff were tenants in common of the products.

Does the 10th section of the act of 1872 give a lien to the land owner who advances supplies to laborers who cultivate for a share of the crop? The laborer must have an interest in the "agricultural products," for that is the subject upon which the lien attaches, otherwise there is no lien. If he work for wages in money, plainly there is no lien. Generally the laborer is to be paid in a specific portion of the product, is supplied with food, the chief item of expense, by the hirer.

We must give such construction of the words, if they will admit of it, as will carry out the intention of the law maker. A large part of the crops of this state are cultivated, in common

parlance, "on the shares." The laborers apply their industry, skill and time in planting, cultivating and gathering, on the terms of division of the crops with the land proprietor, as may be agreed. The first section as we have seen, uses the words, "labor done" for "wages." That implies a certain compensation in money or in kind. The 10th section carefully excludes the words for "wages," "work done for wages," or "laborer for wages." The words are in form of every employer as against every laborer employed by him in the production of agricultural crops.

If the section "be restricted to those who are hirelings for part of the crop, for wages," it would practically have but a narrow application, but if it be construed so as to "embrace all laborers engaged in making the crop, for a share thereof, then it would embrace that class who need, more than any others, provisions, clothing and necessary plantation supplies, and moneys advanced for their purchase." The man who is hired for wages, generally eats the food and uses the implements of his employer, and has no need of provisions, plantation supplies, or money to buy them. But the man who works for a share of the crop, generally furnishes his own provisions, clothing, etc., and if he has not the ready means of doing so, they must be got upon a credit. This section offers such security to the employer, whose land he cultivates, that he would be safe in meeting his wants. We are of opinion, therefore, that this section was designed to embrace that large class of laborers who make crops for their "employers," on the shares, and with whom they are tenants in common of the products, and to whom the "employer," whether owner or lessee, furnishes "provisions, clothing and necessary plantation supplies, or money" to procure the same. The law creates the lien to induce such land proprietor to give the credit, and thereby enable laborers to make crops on that plan. That construction would carry out the double purpose, first, of securing the laborer, and, secondly, the land owner. The act of April 17, 1873, is amendatory of and an enlargement of the operation of the act of April,

1872. The first section so extends the lien, as that it protects the interest of the laborer in the crop, until a just and equitable decision thereof; and also protects the share and interest of the landlord, against any debt or judgment against such tenant. The entire scope of the first section of this act, is to assure to the cultivator, on the shares, his equitable and just portion of the crop, and to the land proprietor his part, so that the interest of neither shall be affected by the debts or incumbrances of the other.

It only remains to consider, whether advances made by Ratliff, on the faith of the act of April, 1872, is paramount to the right arising under the trust deed. Clearly the legislature could not create a statutory lien which would impair a prior lien expressly permitted by law. Indeed the thirteenth section declares as much, and makes valid, mortgages and deeds of trust theretofore made.

The case made by the agreement of the parties does not state *when* the supplies were furnished, with more definiteness than is implied in the words "during the year." Certainly Ratliff had no lien for such advances, before the 8th of April, the date of the passage of the law which conferred it. The deed of trust of date 2d of January, preceding, is prior to the law under which Ratliff's claim arose, and took effect upon the crop so soon as it grew.

The question is not involved in this record, of the relative superiority of liens, for advances begun to be made after this act passed, and running through the year, and a deed of trust made after the same date.

We are of opinion that the plaintiff ought to have recovered.

Judgment reversed and a new trial awarded.